**Gary John VAN OOTEGHEM, Plaintiff-Appellee Cross-Appellant,**

v.

**Hartsell GRAY, Individually and in his capacity as Treasurer of Harris County, Texas, (Henry E. Kriegel, successor in office), Defendant-Appellant Cross-Appellee.**

**No. 78-3711.**

United States Court of Appeals, Fifth Circuit.

Oct. 22, 1980.

Joe Resweber, Billy E. Lee, Houston, Tex., for defendant–appellant cross–appellee.

J. Patrick Wiseman, Hormachea & Sauer, Larry W. Sauer, Jr., Houston, Tex., for plaintiff–appellee cross–appellant.

Before GOLDBERG, GARZA and REAVLEY, Circuit Judges.

GOLDBERG, Circuit Judge:

We are asked today to review the last scene of a real–life drama in which the lead actor, defendant Hartsell Gray, was featured in several roles. The district court concluded the performance by determining that Gray, while acting in his official role as Treasurer of Harris County, Texas, had discharged his co–star, plaintiff John Van Ooteghem, in contravention of the latter's First Amendment right to free speech. As the final curtain fell, the district court ordered the defendant to reinstate Van Ooteghem to his role as Assistant County Treasurer and awarded back pay which, in light of Gray's having acted in his official capacity in wrongfully dismissing Van Ooteghem, was to be paid from the Departmental Budget of the County Treasurer's Office. Appellant now challenges the finding of liability and the determination that the back pay award should be satisfied by Harris County. Finding that the district court was correct on both points, we perform the encore by affirming its decision. We do, however, remand the case on the issue of attorney's fees.

## I. The Factual Background[1]

In January 1975, plaintiff John Van Ooteghem was hired by defendant Hartsell Gray, the Treasurer of Harris County, Texas, to serve first as Cashier Assistant County Treasurer, and later as Assistant County Treasurer. Van Ooteghem performed his job in a professional manner: he was recognized to be both hard working and quite brilliant. Accordingly, Treasurer Gray treated the plaintiff with the respect due to a professional: Van Ooteghem was allowed to set his own hours and to take time off as needed.

On July 28, 1975, Van Ooteghem informed Gray that he was a homosexual and, shortly thereafter, related his plans to address the Commissioners Court on the subject of the civil rights of homosexuals. On July 31, 1975, Gray forwarded a letter to Van Ooteghem which purported to restrict the latter to his office between the hours of eight a. m. and twelve noon and from one p. m. until five p. m., Monday through Friday. These hours corresponded to the times during which citizens were allowed to address the Commissioners Court. Van Ooteghem was instructed to acknowledge his agreement with the new schedule by signing the letter; upon his refusal to do so, Van Ooteghem was dismissed.

In response, Van Ooteghem filed suit, pursuant to 42 U.S.C. § 1983,[2] alleging that he was dismissed as Assistant County Treasurer in violation of his constitutional right to free speech.

## II. The Constitutional Violation

■ While it is true that Van Ooteghem, a nontenured employee, could have been fired for no reason whatsoever, it is also true that no public employee can be dismissed from his job for a constitutionally infirm reason. See Mt. Healthy City School District v. Doyle, 429 U.S. 274, 283–4, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). No governmental benefit can be denied for a reason that infringes constitutionally protected interests, including freedom of speech. See,

1. The district court decided the case on the basis of stipulated facts.

2. 42 U.S.C. § 1983 provides:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

e. g., Perry v. Sindermann, supra; Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

In assessing whether Van Ooteghem's dismissal constituted a violation of his First Amendment right to free speech, the district court was faced with a tripart inquiry:

    1. Was Van Ooteghem's speech to the Commissioners Court a "substantial" or "motivating" factor in his being dismissed;

    2. Was this speech constitutionally protected; and

    3. Would Van Ooteghem have been fired, in the absence of his decision to address the Commissioners Court?

See Mt. Healthy City School District v. Doyle, supra, 429 U.S. at 287, 97 S.Ct. at 576; Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). The court below decided each of these three questions in favor of Van Ooteghem and we have been asked by appellant to review all three findings. But our review is no easy task as substantial confusion exists as to the proper scope of appellate review and the standards to be employed in addressing each of these three questions.

Many appellate decisions—especially in Title VII discrimination suits—have characterized the issue of an employer's motivation in dismissing an employee as one of ultimate fact, subject to plenary review. See, e. g., Jefferies v. Harris County Community Action Association, 615 F.2d 1025, 1031 n.5 (5th Cir. 1980); Parson v. Kaiser Aluminum & Chemical Corp., 575 F.2d 1374, 1382–3 (5th Cir. 1978); Causey v. Ford Motor Company, 516 F.2d 416, 420–1 (5th Cir. 1975). On the other hand, recent Supreme Court cases in the area have treated the question of the employer's motivation as one of "subsidiary" fact, subject only to "clearly erroneous" review. See, e. g., Branti v. Finkel, 445 U.S. 507, 100 S.Ct.

1287, 1291 n.6, 63 L.Ed.2d 574 (1980); Givhan v. Western Line Consolidated School District, supra, 99 S.Ct. at 697. In the majority of cases, the appellate court never articulates the standard it is employing in reviewing this question. Predictably, in the case at bar, appellant urges that we independently review the district court's finding that Van Ooteghem was fired for exercising his right to free speech, while appellees maintain that this conclusion must stand as long as we cannot find it to be "clearly erroneous."

Both parties in this action admit that Van Ooteghem's insistence on addressing the Commissioners Court (which could only occur during the normal working day) precipitated the dismissal. However, the two sides characterize this one issue quite differently. Appellant argues that the event represented clear insubordination by an employee in unilaterally choosing to violate assigned working hours. Appellee responds that the institution of assigned hours and the subsequent dismissal for their breach were aimed solely at stymieing Van Ooteghem's free speech. The district court agreed with Van Ooteghem, finding that his speech to the Commissioners Court was a substantial factor in the decision to dismiss.

In making this finding, the district court was faced with a clear factual choice: was Van Ooteghem fired for his mere absence from work regardless of the purpose of this absence, or, alternatively, was the establishment of set working hours and the dismissal for their violation an attempt to prevent and punish his decision to speak to a political body on a controversial, political issue? Pursuant to Federal Rule of Civil Procedure 52,[3] the district court's finding on this factual issue cannot be set aside absent clear error. It is improper for an appellate court to subvert the clear mandate of Rule 52 by applying the phrase "ultimate fact" to important factual questions or to the last fac-

---

**3.** Federal Rule of Civil Procedure 52 provides in pertinent part:

    "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be giv-

en to the opportunity of a trial court to judge of the credibility of the witnesses." ·

tual determination in a given case, in order to justify "plenary review" of an issue. Rather, use of the phrase "ultimate fact" should be limited to those determinations which, although appearing at first glance to involve only issues of fact, actually require the application of a lurking legal standard to the predetermined facts of a case. In such cases, the appellate court's expertise in interpreting and applying the law justifies reliance on the term "ultimate fact" to distinguish the question from those which cannot be reversed, pursuant to Rule 52, unless "clearly erroneous."

■ We cannot say that the trial judge's finding that Van Ooteghem's speech to the Commissioners Court was a substantial or motivating factor in his dismissal was clearly erroneous. Immediately after Van Ooteghem's announcement of his plan to address the Commissioners Court, Gray imposed a time schedule restricting Van Ooteghem to his office between set hours. Although the time schedule did not appear to be overly burdensome on its face, the new regulation was completely inconsistent with the professionalism that had previously typified Van Ooteghem's relationship with Gray and the Treasurer's Office. Van Ooteghem's compliance with the schedule would have necessitated the abandonment of his plan to address the Commissioners Court. The stipulated facts provide no basis from which any justification for the new schedule can be reasonably inferred, other than the desire to thwart Van Ooteghem's lobbying on behalf of homosexuals.

Having concluded that Van Ooteghem's speech was a substantial factor in his dismissal, we turn to the second part of our inquiry—whether the speech was constitutionally protected. The applicable test originates from the Supreme Court's opinion in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968):

> The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

Employing this test, the district court concluded that, on balance, Van Ooteghem's address was constitutionally protected.

■ We regard the ultimate determination of whether an individual's speech was "constitutionally protected" to be a question of law. However, in balancing the interests discussed in *Pickering* in order to assess the protected nature of a given speech, an appellate court is constrained, absent clear error, to follow the trial court's findings as to the amount of disruption in the workplace caused by the employee's speech. In the present case, the trial court found that Van Ooteghem's speech did not significantly interfere with the operation of the Treasury nor did it impede Van Ooteghem's performance of his daily duties. Based on the stipulated facts of this case, we cannot find these conclusions to be clearly erroneous.

■ Having accepted the trial court's finding as to the insignificance of the disruption caused by Van Ooteghem's speech, we are clearly led to the conclusion that, as a matter of law, Van Ooteghem's speech was "constitutionally protected." The state cannot prevent the speech of its citizen absent a compelling state interest. *See Branti v. Frankel*, 445 U.S. 507, 515, 100 S. Ct. 1287, 1293, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976); *Buckley v. Valeo*, 424 U.S. 1, 64–5, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976). In the employment context, this compelling state interest standard is satisfied only upon proof that the regulation of speech was necessary to prevent "a material and substantial interference" with the operation of the public department. *Hastings v. Bonner*, 578 F.2d 136 (5th Cir. 1978). Gray's imposition of a restricted schedule was not justified by the need to prevent a material and substantial interference with the Treasury. It may be true that some treasury workers, or Gray himself, found the prospect of an employee addressing the Commissioners Court on homosexual rights to be distressing. How-

ever, the ability of a member of a disfavored class to express his views on civil rights publicly and without hesitation–no matter how personally offensive to his employer or majority of his coemployees–lies at the core of the Free Speech Clause of the First Amendment.[4] Thus, the type of disturbance possibly present here, as a matter of law, cannot present a "substantial and material interference." *Id.*

Up to this point, we have concluded that Van Ooteghem's constitutionally protected speech was a substantial factor in his dismissal. While it is clear that a dismissal of an employee, which is substantially based on protected speech, constitutes a violation of the Constitution, the Supreme Court has recently concluded that such a violation does not justify remedial action[5] absent proof that "but for" the protected speech the employee would not have been dismissed. *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977). The Court considered the issue of causation to be one of fact, *id.* at 576, and remanded the *Mt. Healthy* case for a determination whether the employee in that case would have been dismissed absent the protected conduct.

In the case at bar, the district court found that Van Ooteghem would not have been dismissed but for his speech to the

Commissioners Court. We cannot say that such a finding was clearly erroneous. Van Ooteghem was shown to be brilliant and hard working. The record is absolutely devoid of any collateral justification for his discharge.[6]

### III. *Assessing Damages: The Many Shades of Gray*

Although Gray's dismissal of Van Ooteghem constituted a violation of the latter's constitutional rights, there is some doubt against whom the back pay award should be assessed. This doubt arises as a result of the fact, noted earlier, that throughout the scenario leading to Van Ooteghem's dismissal, Hartsell Gray appeared in several different roles. The County would have liked at trial to point the accusatory finger at Gray–the–citizen, thus rendering him personally liable to the plaintiff. In return, Gray–the–citizen would have desired to lay blame on his alter ego, Gray–the–official–representative–of–Harris–County, thereby saddling liability on the County.

Spurred by these multi–interests on appeal, appellant Hartsell Gray–in–his–official–capacity has attempted to escape all liability by rewriting the script and creating a new hybrid villain–Hartsell Gray–the–Treasurer. On the one hand, appellant ar-

---

4. In affirming the district court's finding that Van Ooteghem's speech was constitutionally protected, we add a note of caution concerning the test, first announced in *Pickering*, as to whether speech is "constitutionally protected." Since the formulation of the *Pickering* test in 1968, the Supreme Court has refined the analysis employed to accommodate the interests of the State and those of its citizenry under the First Amendment. Although the court in *Pickering, supra,* pursued this inquiry in terms of whether the speech in question was, "on balance", "constitutionally protected", 391 U.S. at 568, 88 S.Ct. at .1734, subsequent cases have clearly established that the analysis is more properly phrased as to whether the government's regulation of constitutionally–protected speech is justified by a compelling state interest. *See, e. g.; Branti v. Finkel, supra,* 100 S.Ct. at 1293. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 2864, 49 L.Ed.2d 547 (1976); *Buckley v. Valeo,* 424 U.S. 1, 64–65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976).

5. It is likely that the Supreme Court would permit an award of nominal damages to rectify a constitutional violation that was not proven to be the cause of the dismissal. *Cf. Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (nominal damages recoverable for violation of procedural due process in the absence of proof of actual damages).

6. Having affirmed the district court's finding that Van Ooteghem's speech was the cause of his dismissal, we find appellant's arguments that new evidence has been found indicating that Gray had independent justification for firing Van Ooteghem to be irrelevant. Gray had no knowledge of these other justifications at the time of the dismissal; therefore, they could not have served as the basis of the dismissal. As noted earlier, while Van Ooteghem could have been fired for no reason whatsoever, it was a violation of his First Amendment right to free speech to fire him for addressing the Commissioners Court.

gues, it was Gray–the–Treasurer and not Gray–the–citizen who fired Van Ooteghem, so no personal liability can be assessed. At the same time, appellant notes, it was Gray–the–Treasurer and not Gray–the–official–representative–of–Harris–County, who appeared in court, so that to impose liability on Harris County would constitute a violation of due process. Despite these chameleonic antics, the district court determined that Hartsell Gray was acting in his official capacity when he dismissed Van Ooteghem and that the back pay award could be levied against Harris County. We agree.

### A. Gray–the–Citizen Versus Gray–the–Official–Representative–of–Harris–County

■ In contesting the assessment of damages against Harris County, appellant first argues that a county cannot be held liable for the action of its official in dismissing a county employee.

The Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), clearly delineated the guidelines for determining the cases in which a county will be considered to have acted as a "person" subject to suit under 42 U.S.C. § 1983:

> We conclude, therefore, that a local government may not be sued for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

98 S.Ct. at 2038.

As is true of almost every newly–evolved legal standard, the application of the *Monell* test is not as easy as its delineation. The Supreme Court in its justifiable authoritarian voice in *Monell* has spoken and we workers in the judicial vineyard must labor together to attain the result that their wisdom commands. The question whether Gray's dismissal of Van Ooteghem was an

"injury inflicted solely by [the County's] employees or agents" or, alternatively, whether it represented "the execution of a government's policy . . . made by [one] whose . . . acts may fairly be said to represent official policy" would be difficult to address without guidance. Fortunately, the necessary assistance has been provided by the recent and insightful discussion of the *Monell* problem in *Familias Unidas v. Briscoe*, 619 F.2d 391 (5th Cir. 1980). In considering a Texas county's liability for the actions of a county judge in a § 1983 action, Judge Reavley noted:

> Because of the unique structure of county government in Texas, the judge–*like other elected county officials, such as the sheriff and treasurer*–holds virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein. [S. MacCorkle, D. Smith & J. May, Texas Government 347 (7th ed. 1974)]; E. Jones, J. Ericson, L. Brown & R. Trotter, Practicing Politics in Texas 205 (3d ed. 1977). Thus, at least in those areas in which he, alone, is the final authority or ultimate repository of county power, his official conduct and decisions must necessarily be considered those of one "whose edicts or acts may fairly be said to represent official policy" for which the county may be held responsible under section 1983. *Monell v. Department of Social Services*, 436 U.S. at 694, 98 S.Ct. at 2038. *See generally*, Schnapper, *Civil Rights Litigation After Monell*, 79 Colum.L.Rev. 213, 215–19 (1979).

*Familias Unidas v. Briscoe*, 619 F.2d 391 at 404 (5th Cir. 1980) (emphasis added).

There is little doubt as to the wisdom of holding a county liable for an official's acts undertaken in those areas in which the official is the "final authority" or "ultimate repository of county power." The only way a county treasurer, or any local government entity, can establish "official policy" is through the actions of the individual, or group of individuals, who possess final authority within that body. Moreover, in the

inevitable bureaucracy of our complex society, the policy decisions need not always emanate from apoghean planes in the hierarchy, but often may have their source in subordinate realms. A county must be held accountable for more than its officially–codified policies; in cases where the written law of a local government entity vests unbridled authority in certain areas in an individual, his decisions become the controlling law and official policy of the entity.

Hartsell Gray was an elected official equal in authority to the County Commissioners in his domain. Pursuant to Texas law, Gray had complete authority for the hiring and firing of personnel within the Treasury. Tex.Rev.Civ.Stat.Ann. art. 3912c (Vernon 1966). When he so acted, he acted for Harris County; when he so erred, he erred for the County. Pursuant to the test enunciated in *Familias*, Gray's dismissal of Van Ooteghem clearly represented "official policy" for which Harris County may be held liable.[7]

### B. *Gray – the – Official – County – Representative Versus Gray–the–Treasurer*

■ Appellant also argues that even if, in some circumstances, it is proper to hold a county liable for the wrongful actions of its official under *Monell*, it is a violation of due process to do so when the county itself was not actually named as a defendant in the action. Appellant by no means disputes that Hartsell Gray was named as a defendant in his official capacity; rather, he seems to argue that the mere naming of the official treasurer of the county as a defendant does not serve to make the county itself a party to the action. As noted above, this argument attempts to distinguish between Gray as a Treasurer and Gray as an official representative of Harris County. Since the former Gray cannot satisfy the back pay award from the County Treasury without violating the due process rights of the latter Gray (the county), it is argued, the liability must disappear.

Plaintiffs failed to name Harris County as a defendant in its original complaint because, at the time that the complaint was filed, counties could not be held liable as "persons" under § 1983. *See, e. g., Monroe v. Pape, supra.* The script for this play had been written and was in dress rehearsal for decision when *Monell* caused the authors to reexamine the script before a complete rewriting. Although future plaintiffs can, and may be well–advised to, join the local government entity as a defendant in § 1983 actions, we cannot find that the failure to name Harris County expressly as a defendant in this action constituted a violation of due process.

Courts have long recognized that suits against members of government in their official capacity directly implicate the interests of the government itself. As early as 1828, the Supreme Court noted:

> The claim upon the Governor is as a governor, he is sued, not by his name, but

---

7. No party to the appeal has raised the question of conflict of interest arising from the county attorney's representation of Hartsell Gray in all capacities. Moreover, no party could prevail on this issue, given our conclusion that, as a matter of law (under *Familias*), Harris County must be liable for the actions of its Treasurer in the area of employment. However, a serious problem of conflict of interest could exist in future § 1983 actions in which one attorney represents both a county and a county official individually.

The genesis of the problem is easily located. Prior to the Supreme Court's decision in *Monell*, local government entities were not considered "persons" within 42 U.S.C. § 1983 and were not subject to liability under that statute. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The interests of the employee, both individually and in his official capacity, completely coincided. Therefore, both the employee and the county benefitted from being jointly represented. However, the Supreme Court's decision in *Monell* has caused these interests to be realigned into adversity. Adverse interests in litigation require adverse legal counsel.

While the cure is as easily identified as the genesis of the problem, its fate rests in the hands of the Texas Legislature. For example, the County Attorney in the present case was merely following the mandate of Tex.Rev.Civ. Stat.Ann. art. 331h (Vernon 1973) in representing all of the defendants in the lawsuit. Those statutes which provide for the joint representation of a county and its officials should receive the attention of the Legislature in light of the realities presented by *Monell*.

his title. The demand made upon him is not made personally, but officially.

The decree is pronounced not against the person, but the officer, and appeared to have been pronounced against the successor of the original defendant, as the appealed bond was executed by a different governor from him who filed the information. In such a case, *where the chief magistrate of a State is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character, we think that the State itself may be considered a party on the record.* If the State is not a party, there is no party against whom a decree can be made. . . . This not being a proceeding against the thing, but against the person, a person capable of appearing as a defendant, against whom a decree can be pronounced, must be a party to the cause before a decree can be regularly pronounced.

*Governor of Georgia v. Madrazo,* 1 Pet. (26 U.S.) 110, 123–4, 7 L.Ed. 73 (1828) (emphasis added).

The widespread recognition that the government entity itself is the real party in interest in "official capacity" suits has, in the past, presented severe difficulty for courts faced with applying the "person" requirement in § 1983 suits. For example, the Second Circuit in its consideration of *Monell v. Department of Social Services,* 532 F.2d 259 (2nd Cir. 1976), *rev'd,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), held that since municipalities cannot be sued as persons under § 1983 and since suits against city officials in their official capacity were "mere subterfuge" for suits against the real party in interest, the city itself, then city officials could not be sued in their official capacity under § 1983. *Id.* at 266. On certiorari, the Supreme Court in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), specifically agreed with the Second Circuit's conclusion that suits against city officials in their official capacity were merely an alternative form of pleading a suit against the city; however, the Court concluded that both forms of suit were permissible under

§ 1983. In so doing, the Court expressly equated suits against officers in their official capacity with suits against the government:

Since official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name.

*Id.* at 2036 n.55.

As a practical matter as well, Harris County has been fairly treated. Since the inception of this lawsuit, Harris County has been aware, at a minimum, that a former employee was seeking reinstatement–a remedy which by its nature could have implications only for the County. Pursuant to statute, Tex.Rev.Civ.Stat.Ann. art. 332c (Vernon 1973), all defendants in this action were represented by a county attorney. The County had both notice and opportunity to be heard, sufficient to comport with due process. We find, therefore, that the district court's assessment of damages against the county treasury–in light of Hartsell Gray having acted in his official capacity when he dismissed Van Ooteghem– did not constitute a violation of due process.

### IV. *Attorney's Fees*

■ In its judgment of September 29, 1978, the district court ordered defendant to pay plaintiff $7,500.00 to cover "taxable costs including reasonable attorney's fees." The court failed to explain how it arrived at this figure and made no reference to the guidelines for awarding attorney's fees set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). At the time this award was entered, plaintiff had not yet filed his application for attorney's fees, nor had any evidence been submitted to the Court on

which such an award could have been based.[8]

Although its position is not entirely clear, appellant seems to be arguing that it was improper to award fees in the absence of any evidence on the matter, and that, in order for the district court to hear any further evidence, both sides must be allowed to present evidence on any issue. Appellant concludes that in order for attorney fees to be awarded, defendant Gray must be afforded a new trial. He supports this position by citing to "common justice" and to

> the tale of a fellow in a tree that was being shaken by a bear trying to dislodge him. The fellow was calling on the Lord to help him, with no noticeable help forthcoming therefrom. At last he ceased his plea with a final word: "Oh, Lord, if you aren't going to help me, then please don't help that bear."

█ Although we neither profess to be the Lord nor do we support man–eating grizzlies, we do find appellant's contention that a new trial must be granted in order for attorney's fees to be awarded to be totally without merit. Attorney's fees are recovered as part of costs in § 1983 actions; as such, they may be and, in order not to delay the trial on the merits, often should be proven after a decision in the principal case has been reached. *See Gore v. Turner*, 563 F.2d 159, 163 (5th Cir. 1977). A motion for fees is not a motion to alter or amend the judgment, *Knighton v. Watkins*, 616 F.2d 795 (5th Cir. 1980), and therefore, does not require a reconsideration of the judgment.

█ The appellate court does, however, have the duty to review the reasonableness of an award of attorney's fees for an abuse of discretion. *See Johnson, supra*, 488 F.2d at 717. Absent specific findings by the district court following the criteria enunciated in *Johnson*, appellate review of the reasonableness of the fee award becomes a task of pure speculation. Since we ought not to speculate with defendant's money and since an evidentiary hearing–solely restricted to the issue of fees–may be warranted, we vacate the award of $7,500 and remand the case for entry of an order fixing a reasonable[9] fee and reflecting the considerations which led to it. *See id.* Given our concern for speed in judicial productions, we note that the remand for the proper determination of attorney's fees will not require a five act drama but merely an epilogue of slight proportions.

## V. Conclusion

Defendant Hartsell Gray, while acting in his official capacity, dismissed plaintiff John Van Ooteghem in violation of the latter's right to free speech. Damages were properly assessed against Harris County. Finding no error in the proceedings below on the issues of liability and damages, we affirm those sections of the lower court's opinion.

The district court failed to make adequate findings in awarding attorney's fees. We vacate the award of $7,500 in attorney's fees and remand the case for reconsideration of this one issue.

AFFIRMED IN PART AND VACATED AND REMANDED IN PART.

REAVLEY, Circuit Judge, specially concurring:

I concur with the result and the reasoning of the majority's opinion with one exception. I cannot agree with the majority's conclusion in part II of the opinion that the balancing test enunciated by the Supreme Court in *Pickering* has somehow been transformed or "refined" into a compelling state

---

**8.** Plaintiff did formally file his application for attorney's fees on October 18, 1978. The district court subsequently concluded that its original award had been reasonable, but it failed, once again, to justify the award based on the considerations enumerated in *Johnson*.

**9.** We do not, however, by virtue of this remand intimate any view as to the reasonableness of the original award. We note only that, on remand, plaintiff should present proof of reasonable fees associated with this appeal and the remand, in addition to the proof already submitted.

interest test by the Court's subsequent decisions in *Buckley v. Valeo*, 424 U.S. 1, 64–65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976); *Elrod v. Burns*, 427 U.S. 347, 362–63, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976); and *Branti v. Finkel*, 445 U.S. 507, 515, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980). I find no justification for the conclusion that cases subsequent to *Pickering* have "clearly established that the analysis [for determining whether a governmental employer may inhibit its employees' rights of free speech] is more properly phrased as to whether the government's regulation of constitutionally–protected speech is justified by a *compelling state interest*" (p. 493, n.4, emphasis added).

*Branti v. Finkel* and *Elrod v. Burns* involved discharges of governmental employees for patronage reasons. In each case, the Court clearly indicated that when political patronage is practiced the First Amendment rights of *belief* and *association* are restricted. *Branti*, 445 U.S. at 507, 100 S.Ct. at 1289 ("question presented is whether the First and Fourteenth Amendments . . . protect [a governmental employee] who is satisfactorily performing his job from discharge solely because of his political beliefs"); *Elrod*, 427 U.S. at 355, 96 S.Ct. at 2680–81 ("cost of the practice of patronage is the restraint it places on freedoms of belief and association"). In these cases, the Court held that in order for government to impose a restriction on public employment based on party identification, the restriction must survive "exacting scrutiny," which is synonymous with the "compelling state interest" test, *Sherbert v. Verner*, 374 U.S. 398, 406–07, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963); *Bates v. City of Little Rock*, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958).

In this case, however, we deal not with a governmental employee's rights of belief and association, but with his right of free speech. The Supreme Court has chosen to employ different levels of judicial scrutiny with respect to a government's restrictions on its employees' First Amendment rights: the constitutionality of an impairment on a public employee's rights of belief and association is determined by applying the compelling state interest test, *Elrod v. Burns*, 427 U.S. at 362–63, 96 S.Ct. at 2684, while the constitutionality of an impairment on his right of speech is determined by application of a balancing test, *Givhan v. Western Line Consolidated School Dist.*, 439 U.S. 410, 414, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In *Givhan* and *Doyle*, which were both decided subsequent to *Elrod v. Burns*, I fail to find any mention, either express or implied, of a refinement or metamorphosis of the *Pickering* balancing test into a compelling state interest analysis; instead, in both cases the Court restates the *Pickering* test without modification.[1]

I am further convinced that a compelling state interest standard applies to restraints on public employees' rights of belief and association, while a balancing test applies to restraints on their rights to free speech, by reading the cases cited in *Elrod v. Burns*.

---

**1.** It is significant to note the following language from *Givhan*, 439 U.S. at 415 n.4, 99 S.Ct. at 696 n.4:

"Although the First Amendment's protection of government employees extends to private as well as public expression, striking the *Pickering* balance in each context may involve different considerations. When a teacher speaks publicly, it is generally the *content* of his statements that must be assessed to determine whether they 'in any way either impeded the teacher's proper performance of his daily duties in the classroom or . . . interfered with the regular operation of the schools generally.' *Pickering v. Board of Education, supra*, 391 U.S., at 572–73, 88 S.Ct., at 1737. Private expression, however, may in some situations bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message, but also by the manner, time, and place in which it is delivered."

Specifically, as authority for the proposition that "[i]t is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny," the Court in *Elrod* cites *Buckley v. Valeo*, 427 U.S. at 362, 96 S.Ct. at 2684. The portion of *Buckley v. Valeo* referred to dealt with the compelled disclosure requirements of the Federal Election Campaign Act of 1971.[2] The Court in *Buckley* noted that it had "repeatedly found that compelled disclosure, in itself, can seriously infringe on *privacy of association and belief* guaranteed by the First Amendment." 424 U.S. at 64, 96 S.Ct. at 656 (emphasis added). The Court further recognized "that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes [encroachments on privacy of association and belief] cannot be justified by a mere showing of some legitimate governmental interest"; instead since *NAACP v. Alabama*, 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958), the Court has "required that the subordinating interests of the State must survive exacting scrutiny."[3] *Id.*

The Court, by employing different standards to test governmental action that interferes with public employees' First Amendment rights, apparently differentiates between the primacy of the values protected by the rights of belief and association on one hand and the right of speech on the other. Freedom of "political belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. at 356, 96 S.Ct. at 2681. They are the keystone rights of the First Amendment—the most preferred of the preferred rights. A public employee's belief and association rights rarely would result in a material and substantial interference with the interest of government "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. at 568, 88 S.Ct. at 1735. However, the possibility for such interference is greater when the public employee transmits his beliefs in the form of speech.[4] Therefore, it is appropriate that a more lenient—from the governmental employer's perspective—balancing test is applied to restraints on public employees' speech, while a more stringent compelling state interest test is applied to restraints on their rights of belief and association.

The imposition of the compelling state interest test to the area of public employee free speech would work too onerous a burden on the governmental employer. Under the compelling state interest test, the burden is on the government to show the existence of a paramount, vital or compelling interest in conditioning a public employee's continued employment on a restraint of his First Amendment rights, which will further "some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Elrod v. Burns*, 427 U.S. at 362–63, 96 S.Ct. at 2685. A compelling state interest is most often present when the regulated conduct, normally protected by the First Amend-

---

**2.** The law requires all political committees to keep detailed records of contributions. These records must include the name and address of every person contributing in excess of $10 and also his or her occupation and principal place of business if the aggregate contribution exceeds $100. Quarterly reports containing the full name, mailing address, occupation and principal place of business of every person contributing over $100 a year must be filed with the Federal Election Commission.

**3.** In *NAACP v. Alabama*, the Court held that a compelling state interest must be demonstrated before government could impair an individual's First Amendment *right of association* by re-quiring an organization of which he is a member to disclose its membership rolls. 357 U.S. at 463, 78 S.Ct. at 1172.

**4.** I recognize that association is to some extent the outward indicia of belief, as is speech. Association, however, involves subjective elements as well, unlike speech which is purely objective. I also recognize that the line between association and speech is fine and often difficult to discern. Nonetheless, the Supreme Court has decided to test restraints on these rights with different standards. It is not our prerogative to disregard the Court's decision.

**500**

ment, poses "some substantial threat to public safety, peace or order." *Sherbert v. Verner,* 374 U.S. at 403, 83 S.Ct. at 1793. Rarely does government meet this burden when the compelling state interest test is applied. I am aware of only two instances in which the Supreme Court has upheld governmental action when strict scrutiny or the compelling state interest test has been applied. *See Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (holding that contribution and compelled disclosure provisions of the Federal Election Campaign Act do not violate the First Amendment); *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (holding that legal restrictions on persons of Japanese descent during World War II were not unconstitutional).

I conclude that Van Ooteghem's speech was constitutionally protected under the balancing test of *Pickering.* In balancing the interests of Van Ooteghem in commenting on matters of public concern against the interest of Harris County as an employer in promoting the efficiency of public services performed by the county treasurer's office, I look to the values of the First Amendment in "having free and unhindered debate on matters of public importance," *Pickering,* 391 U.S. at 573, 88 S.Ct. at 1737, and whether addressing the commissioners court would "substantially and materially interfere" with the discharge of the duties and responsibilities inherent in Van Ooteghem's employment, *Smith v. United States,* 502 F.2d 512, 517 (5th Cir. 1974). *See Porter v. Califano,* 592 F.2d 770, 773 (5th Cir. 1979). The district court found that Van Ooteghem's "temporary absence to address the Commissioners Court could not have substantially impeded the functioning of the Treasury." I agree with the majority that this finding is not "clearly erroneous." On this basis I concur in the judgment of the court.